[No. B196520. Second Dist., Div. Two. Aug. 7, 2007.]

In re PAUL HYDE on Habeas Corpus.

**COUNSEL**

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill and J. Conrad Schroeder, Deputy Attorneys General, for Appellant State of California.

Richard D. Pfeiffer, under appointment by the Court of Appeal, for Respondent Paul Hyde.

## OPINION

**BOREN, P. J.**—On November 9, 2005, pursuant to Penal Code sections 3041 and 3042,[1] the Board of Parole Hearings (the Board) found Paul Hyde, a prisoner confined in the California Department of Corrections and Rehabilitation, unsuitable for parole and declined to set a parole date. Hyde filed a timely petition for a writ of habeas corpus in the Los Angeles County Superior Court challenging the sufficiency of the evidence supporting the Board's decision. On January 3, 2007, the superior court issued an order granting the petition. The People of the State of California appeal from the January 3, 2007, order.[2]

The People contend that the superior court ignored the relevant standard of judicial review and that the Board's decision Hyde was unsuitable for parole is supported by some evidence, which is all that is required to satisfy the requirements of due process.

We find merit in the People's contention and reverse the superior court's order, thereby reinstating the Board's decision.

### FACTS

### I. *The Commitment Offenses*

In 1973, at age 19, in the Los Angeles County Superior Court case No. A068239, Hyde was convicted of first degree murder (§ 187; count 5), four counts of robbery of the first degree (§ 211; counts 1, 2, 6 & 7), assault with a deadly weapon with the intent to commit murder (former § 217; count 3), and assault by means of force likely to produce great bodily injury and with a deadly weapon (§ 245, subd. (a)(1); count 4), each with the personal use of a firearm (§ 12022.5). In the count 2 robbery, the jury made a finding that he intentionally inflicted great bodily injury. The trial court sentenced Hyde pursuant to the indeterminate sentencing law to a term of life for the count 5 first degree murder. The terms imposed for the counts 3 and 4 assaults were ordered stayed. For the other counts, with the exception of the count 2 robbery, the trial court ordered the terms prescribed by law to be served concurrently. It ordered the term prescribed by law for count 2 to be served

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The appellant in the instant cause and respondent in the superior court is properly James E. Tilton, Secretary of the California Department of Corrections and Rehabilitation.

The Board of Prison Terms recently had its name changed to the Board of Parole Hearings. (§ 5075, subd. (a).)

consecutively to the term imposed for the robbery in count 1, but to be served concurrently to the life term imposed for count 5.[3]

In December 1972 and January 1973, at age 18, Hyde had moved away from his parents' Los Angeles residence after a quarrel and rented an apartment in Santa Monica. During these months, he went on a robbery spree with a firearm. He preyed on at least four local businesses and their employees or owners in order to obtain the funds he needed to pay his living expenses. There were two victims during the robbery of Bill's Bike Shop, and during that robbery, at gunpoint, Hyde threatened to kill the husband/owner if the wife/owner did not remain in the bathroom. During the robbery of the Red Ball gas station, for no apparent reason, Hyde shot the unresisting female employee in the back with a through-and-through shot, causing her to fall. Then, he shot her again in the thigh while she lay on the floor. The

---

[3] Hyde's 1973 convictions predate the enactment of the 1977 determinate sentencing law. In 1973, Hyde was sentenced to a straight life term for the first degree murder in count 5, enhanced by a finding of the use of a firearm, which required the imposition of an additional term of "not less than five years," or a term of five years to life. (Former § 12022.5, similar to the present section, was added by Stats. 1969, ch. 954, § 1, p. 1900; see former § 671, Stats. 1872, as amended by Stats. 1951, ch. 1674, § 1, p. 3829, repealed by Stats. 1976, ch. 1139, § 270, p. 5139, operative July 1, 1977 [punishment for not less than a specified number of years and no limit to the duration of punishment means the maximum term is life].) The four robberies in counts 1, 2, 6 and 7 were of the first degree, either because Hyde was armed with a dangerous or deadly weapon, or because in the robbery in count 2, the jury returned a finding of the intentional infliction of great bodily injury. (Former § 211a, added by Stats. 1923, ch. 127, § 1, p. 270, as amended by Stats. 1961, ch. 1874, § 1, p. 3975, repealed by Stats. 1986, ch. 1428, § 1, p. 5123.) The three armed robberies were punishable by terms of "not less than five years," i.e., terms of five years to life. (Former § 213, similar to the present section, was enacted in 1872, as amended by Stats. 1967, ch. 149, § 1, p. 1216.) The robbery committed with the intentional infliction of great bodily injury was punishable by a term of 15 years to life. (Former § 213.) All the offenses were enhanced by findings of the use of a firearm, which, as stated above, required consecutive terms of five years to life. The 1977 determinate terms for the robbery offenses and the assault with the intent to commit murder offense were two, three, and four years. (Former § 213, similar to the present section, was enacted in 1872, as amended by Stats. 1976, ch. 1139, § 138, p. 5100, operative July 1, 1977, Stats. 1977, ch. 165, § 5, p. 642, eff. June 29, 1977, operative July 1, 1977; former § 217, as amended by Stats. 1976, ch. 1139, § 140, p. 5100, operative July 1, 1977, repealed by Stats. 1980, ch. 300, § 2, p. 628.) The 1977 determinate terms for assault by means of force likely to produce great bodily injury and with a deadly weapon were 16 months, two years, and three years. (§ 245, subd. (a), Stats. 1872, as amended by Stats. 1976, ch. 420, § 3, p. 1077, ch. 1126, § 7, p. 5042, ch. 1138, § 5, p. 5058, ch. 1139, § 152.5, p. 5105, operative July 1, 1977.) The enactment of the section 12022.7 enhancement for the infliction of great bodily injury did not occur until 1977, and the determinate term for that enhancement was three years. (Added by Stats. 1976, ch. 1139, § 306, p. 5162, operative July 1, 1977, as amended by Stats. 1977, ch. 165, § 94, p. 679, eff. June 29, 1977, operative July 1, 1977.) The 1977 determinate term for the section 12022.5 use of a firearm enhancement was a consecutive term of two years. (Former § 12022.5, as amended by Stats. 1975, ch. 278, § 1, p. 700, Stats. 1976, ch. 1139, § 305, p. 5162, operative July 1, 1977, Stats. 1977, ch. 165, § 92, p. 678, eff. June 29, 1977, operative July 1, 1977.)

second bullet lodged in her groin. Later, he fatally shot a 63-year-old shoe repair business owner in the chest and abdomen. Hyde apparently was not charged with a robbery in connection with the murder as it was not entirely clear whether he had robbed the victim.[4] Then, during two successive later robberies, defendant used a gun, confronting two employees in one robbery, and confronting one employee in the other. In total, Hyde obtained less than $250 during the robbery spree.

Hyde had no prior criminal history.[5] While in prison, Hyde pled guilty to a 1990 unlawful weapon possession offense (§ 12020) that is further described below. For that offense, the trial court sentenced Hyde to prison for a concurrent term of two years.

## II. *Background*

Hyde, now age 53, is an inmate at the Deuel Vocational Institute. Defendant's minimum parole date was January 13, 1980. Prior to the current hearing, he had been found unsuitable for parole 19 times. The record fails to disclose the reasons for the earlier findings of unsuitability, except that at the prior April 15, 2004, suitability hearing, the presiding commissioner had commented that apart from the gravity of the offense, Hyde had "not sufficiently participated in beneficial self-help at this time."

His 2005 psychosocial assessment revealed that he had a normal childhood, he has no physical or mental problems, his family background is good, and he has family support from his mother and five law-abiding and successful siblings. Upon his arrest, he was five credits short of graduating from high school. In prison, he obtained his high school diploma, and he had earned 63 college credits. Currently, he was taking the one algebra class he needed to obtain a degree.

In prison, Hyde became a clerk, and in 1997 he participated in the electronics apprenticeship program. He explains that his primary vocational focus is "computer service." In 2002 he began in the prison industries wood

---

[4] The record fails to indicate whether the People obtained Hyde's first degree murder conviction on a theory of premeditated murder or on a theory of felony murder. But it appears that Hyde was not charged with the robbery of the shoe repair business owner in a separate count, apart from the charge of murder. The victim's relatives speculated that there might have been a robbery because only $10 cash was found on the premises, and they believed that the victim kept about $50 in cash in his shop.

[5] In 1971 one petition alleging grand theft from the person was filed against Hyde in the juvenile court. The victim, another teenager, eventually admitted that she made the complaint because she had spent her mother's money without permission. She acknowledged that she made up the story of the theft to cover up her own wrongdoing, and the juvenile court dismissed the petition.

shop, and he is currently the lead man in the paint shop. He has a certificate of proficiency in painting and has written an instructional booklet for the paint shop. Hyde was confident that he could obtain employment in the computer field. He also has plumbing, electronic, glazing, wood cabinetry and painting skills, all acquired in prison. Hyde had a number of laudatory chronos from the prison staff. His job rating reports from the staff are exceptional, and the staff said that he is courteous to all, hard working, and a stabilizing factor in the prison population. Hyde appears to have participated in every educational and self-improvement class or activity available to him. He participates in the protestant chapel, and he has held or holds positions of inmate leadership in various prison organizations. He has several job offers pending.

He had been married twice while in prison. He has a 24-year-old daughter from the second union, and his wife has two other children from another union. Upon his release, he plans to live with his current wife and to be employed at a computer firm owned by one of his siblings. He has no history of substance abuse.

During his early years in prison, he had no disciplinary writeups. Thereafter, from 1977 to 1980, he had nine disciplinary "115 conduct infractions." During the period of 1985 to 1986, he had three additional 115 conduct infractions. In 1989 and 1991 he had respective 115 conduct infractions for possessing an inmate-manufactured weapon and for a physical altercation with his cellmate, whom he claimed had made sexual advances to him. In 1990 he suffered a felony conviction for possessing a dangerous weapon, a dirk or dagger (§ 12020, subd. (a)), which is related to the above prison infraction. The circumstances of this offense are that a prison guard saw defendant hiding in his hand a prison-manufactured, 15-inch, pointed aluminum stabbing weapon. For this offense, he was found guilty at the institutional level and "endorsed by the staff for a ten-month sheet terms." Six months later, "due to Hyde's history of [the Security Housing Unit] placement and continual negative behavior," he was "endorsed for a determinative [unintelligible] at Folsom Bay State Prison." His explanation for the weapons offense was that he was "[t]rying to draw staff's attention to problems which were occurring at CMF."

For the 14 years preceding the current suitability hearing, Hyde had been discipline free. His last "115" was in 1991, when he was 37 years old.[6] The

---

[6] His 2003 evaluation report showed that his "CDC 115's" "consisted of Disrespect, Running from an officer when ordered to stop, Refusing to work, Threatening a C/O, Throwing a food tray in the dining hall, Rights and Respects of others, Conduct, Deliberately Spitting on [another inmate], Conduct That Could Lead to Violence, Force and Violence, Threatening an[d] Pressuring other inmates, Inciting others to Use Force or Violence against P.C. inmates,

psychosocial assessment indicated that "the inmate has shown significant development and emotional maturity and control over his impulses through the years. He has transformed himself from an immature self-referenced, impulsive anti-social youth into a mature, confident and self-controlled adult focused on helping others and leading a productive, non-violent life in the community."[7]

In the 2005 psychosocial assessment, Hyde explained the circumstances of the 1972 to 1973 crime spree. He said that he had obtained the gun for self-protection as he was the target of a local gang. He acknowledged that he had committed the robberies for money. He explained that at the time, he was focused on his own needs, and while he did not intend to hurt anyone, he also committed the robberies with no concern for his victims. He said that the

---

Possession of an Inmate Manufactured Weapon, Physical Altercation/Fighting." It also disclosed "CDC 128's," the last of which occurred in 1995, consisting of a verbal altercation with a sergeant, canteen procedures, "CDC 115 reduced to 128A" for possessing money, phone procedures, contraband, conduct, disruptive behavior, and "curtain."

[7] At the hearing, Commissioner Mejia asked Hyde what made him "slow down?" Hyde replied, as follows: "I don't know that I would exactly put it in those words. The 115's were all serious and major, but only the last one was a violent was [sic], because it was for a fight. The others were generally for running my mouth. And that was a cell fight with my cellie, old conflicts that existed between us. In terms of what made me slow down, I don't know exactly how to answer that." Commissioner Mejia said his point was that something must have happened to trigger the sudden change in conduct. Hyde replied: "At some point you gotta grow up, you know? You can look around yourself in here and see yourself in other people, and it's not always pleasant, you know. Some people in here, they're whole world is creating conflict and being involved in some sort of chaos. And when you look at them and see yourself you can either remain there or be somebody different, you know. Like I said, at some point, you just have to grow up, if you ever want to get out of this place. I don't want to be here for the rest of my life. That means my conduct has to change. And if I can see what someone else does to another person and dislike it, if I'm doing the same thing than I'm no better than he is. So, something has to change." Hyde added that he was no longer concerned with the activities going on between the inmates. He said that he used to be interested. But now he wanted to go home. Before, he was concerned in being a "good brother" and showing that he was a "strong convict." Now, he just wanted to be a man. The presiding commissioner asked if there was a single event that led to his behavior change. Hyde replied that when he was imprisoned in the "hole" the last time, he had asked himself why he always ended up in trouble, and he decided that he was going to find a way to sidestep trouble. He decided to be involved with what was positive. Previously, he had not had the strength to say no to the other inmates, and he had wanted to be doing what everyone else was doing. Now he did what he needed to do for himself, which was to avoid problems, to help others, and to take the programs necessary to earn parole. The commissioner asked whether he had been "in the hole" in the last five to six years, and Hyde replied in the affirmative. Hyde explained that one disciplinary action arose because his cellmate had been conducting a thriving drug business, which Hyde claimed he did not know about, and it took two weeks for staff to determine that he was not uninvolved. On another occasion, the staff believed that he had repaired a computer to which he was denied access. However, that order was rescinded in 24 hours because he had not accessed the computer, and the staff discovered the truth. He said that in the self-help programs, he had learned to accept responsibility for his misconduct.

nonfatal gas station shooting was an accident. He asserted that he was inexperienced with a gun, and he pulled the hammer back during the robbery. His hands were sweaty, and his thumb slipped twice. During the shoe repair shop murder, he claimed that he ducked into that store with his gun when local gang members were chasing him. The victim surprised him by yelling and running up behind him with hands raised. Hyde said that almost in a reflex action, he fatally shot the elderly man.

Hyde had expressed remorse for the crimes and said that he had developed empathy for his victims.

The assessment of dangerousness in the 2005 psychosocial report listed the following factors as supporting a "higher level of dangerousness or probability of recidivism." The evaluator explained as follows. Hyde had committed five crimes in which he was armed with a firearm. Even after he severely injured and killed someone, he continued to use the gun during the robberies. The evaluator concluded that Hyde's conduct discloses a "wanton disregard for the safety of others," and it has taken Hyde a number of years to develop the emotional maturity to "own responsibility" for his conduct. The evaluator said that Hyde continues to have difficulty acknowledging his faults and weaknesses, as is evidenced by his claim his thumb slipped during the gas station shooting. However, his expressed remorse for his conduct appears genuine. Hyde is a productive worker with a lot of initiative and comprehensive training. During his initial incarceration, Hyde had difficulty with compliance with the prison rules and acceptance of authority. However, now, through participation in prison programs, he has effective communication, anger management, and conflict resolution skills. He has insight and has taken strides in personal responsibility, he has accepted recommendations made during previous suitability hearings. His parole plans appear feasible. "Assessment of dangerousness both within . . . the institution and if released . . . are significantly below average in comparison with other inmates."

The only concern expressed by the evaluator was that the father of the children of Hyde's wife, another prison inmate, may upon his own prison release be a destabilizing factor. Hyde claims no animosity toward the other inmate, but the feelings of the other inmate are uncertain.

The Los Angeles County deputy district attorney attended the hearing. He expressed dissatisfaction with Hyde's failure to make restitution in the case and told Hyde that his office would not recommend parole until Hyde did more with respect to accepting responsibility for the crimes. During the hearing, Hyde expressly declined to offer further explanations about how the offenses had occurred. After the deputy district attorney's comments, Hyde's counsel commented that the 2005 psychosocial assessment indicated that

Hyde's remorse was genuine and that Hyde had accepted responsibility for the crimes. Counsel did not believe that for purposes of obtaining a suitability finding, anything more was required of Hyde. Hyde personally explained why, early on, he had presented conflicting explanations about the offense. He also commented that because he was the only person present during the murder, the circumstances of the murder would always be in dispute. He said that he had acknowledged guilt and had accepted responsibility for his crimes and that he could not change the crimes—he could only change himself.

III. *The Board's Decision*

At the commencement of the sections 3041 and 3042 hearing, the presiding commissioner indicated that they were holding a parole suitability hearing. He said that the panel would consider the offenses, Hyde's criminal and social history, his behavior and programming since commitment, his progress since commitment, the updated counsels' report, and the psychological report, along with any changes in the parole plan.

After the hearing, the presiding commissioner said that panel's decision was that Hyde was unsuitable for parole. The commissioner said that Hyde remained "a risk of danger to society or the public safety." He said that "the crime is the crime, and that's all we're dealing with here today, is the crime." The commissioner broadly summarized the events of the 1972 to 1973 crime spree and said, "You were especially cruel and callous, with multiple crimes, multiple victims, [and had committed the crimes] in a calculated manner" and in a manner that demonstrated an "exceptional disregard for human suffering." He mentioned that the motive for the crimes was robbery, suggesting that the panel had decided that the motive for the crime spree was trivial in relation to the gravity of the offenses. The commissioner mentioned the Los Angeles County District Attorney's opposition to a suitability finding and indicated that all other relevant factors were strongly favorable to a finding of suitability and to setting a parole date.

IV. *The Decision of the Superior Court*

Hyde filed a petition for a writ of habeas corpus in the superior court. In the petition, Hyde claimed the Board's decision violated due process as "some evidence" failed to support the finding. Specifically, Hyde argued that the 1972 and 1973 commitment offenses were remote in time and therefore unreliable in supporting a finding that he was unsuitable for parole. Further, because the only factor the Board's decision relied on to deny a parole date was the remote and unreliable commitment offenses, the Board's decision was also arbitrary as the Board had failed to give full consideration to all relevant factors under law, factors which uniformly demonstrated suitability.

The superior court reversed the Board's decision and said the following: "In denying petitioner parole, the Board relied upon the circumstances of the commitment offense. The Court finds that because 33 years have passed since petitioner's crime, the usefulness of the crime in predicting the likelihood of future offenses diminishes in time. (*In re Scott* (2005) 133 Cal.App.4th 573, 595 [34 Cal.Rptr.3d 905].) The Court finds that the Board's continued reliance on an inmate's commitment offense violates due process when viewed in light of a record of rehabilitation. (*In re Elkins* (2006) 144 Cal.App.4th 475, . . . [50 Cal.Rptr.3d 503]; *Scott*[, *supra*,] 133 Cal.App.4th [at pp.] 593–594.) Furthermore, the true 'test is not whether some evidence supports the reasons the [Board] cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety.' (*In re Lee* (2006) 143 Cal.App.4th 1400, 1408 [49 Cal.Rptr.3d 931]; see also *Elkins*[, *supra*,] 144 Cal.App.4th 475, 521).) After more than three decades of incarceration, reliance upon such unchanging circumstances violates due process because these immutable circumstances become unreliable predictors of petitioner's dangerousness such that they can no longer fulfill the 'some evidence' standard. The Court finds that there is no evidence that petitioner's release on parole unreasonably endangers the public. Petitioner has been discipline free for 14 years and a 2005 psychological report indicates that petitioner's 'dangerousness . . . if released into the community is significantly below average in comparison with other inmates.' [¶] . . . [¶]

"The Court finds that petitioner's continual parole denials have been based mainly on the gravity of the commitment offense, the circumstances of which can never change. Therefore, the Board's continued reliance on unchanging factors will essentially convert petitioner's original sentence of life with the possibility of parole into a sentence of life without the possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005) 358 F.Supp.2d 936, 947.)"

The superior court ordered the matter remanded to the Board "to reconsider its decision and to conduct a new hearing within 45 days" of the service of its order. It further ordered that at the new suitability hearing, the Board was "to reconsider suitability for parole using, without restriction, the factors deemed appropriate by the relevant statutes and regulations in accordance with the requirements of due process."

## DISCUSSION

The People contend that Hyde's offenses were "exceptionally egregious," and thus the gravity of the crimes provides "some evidence" to support the Board's decision. They assert that by finding the requirements of due process

were not met, i.e., the evidence was insufficient to support the administrative decision, the superior court necessarily had to assign a probative value to the offenses. The superior court's decision had the effect of reweighing of the evidence, which is not permitted under the appropriate "some evidence" standard of review as it is stated in *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).

We agree with the People's claim that some evidence supports the Board's finding on parole suitability.

Section 3041, subdivision (b), requires that "[t]he panel . . . shall set a [parole] release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."[8] In title 15, section

[8] The pertinent provisions of section 3041 are as follows: "(a) In the case of any inmate sentenced pursuant to any provision of law, other than Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, the Board of Parole Hearings shall meet with each inmate during the third year of incarceration for the purposes of reviewing the inmate's file, making recommendations, and documenting activities and conduct pertinent to granting or withholding postconviction credit. One year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime. . . . [¶] (b) The panel or the board, sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting. . . ."

Section 3042 provides in pertinent part: "(a) At least 30 days before the Board of Prison Terms meets to review or consider the parole suitability or the setting of a parole date for any prisoner sentenced to a life sentence, the board shall send written notice thereof to each of the following persons: the judge of the superior court before whom the prisoner was tried and convicted, the attorney who represented the defendant at trial, the district attorney of the county in which the offense was committed, the law enforcement agency that investigated the case . . . . [¶] (b) The Board of Prison Terms shall record all those hearings and transcribe recordings of those hearings within 30 days of any hearing. [¶] (c) At any hearing, the presiding hearing officer shall state his or her findings and supporting reasons on the record. [¶] (d) Any statements, recommendations, or other materials considered shall be incorporated into the transcript of the hearing, unless the material is confidential . . . . [¶] . . . [¶] (f)(1) The written notice to the judge of the superior court before whom the prisoner was tried and convicted shall be sent by certified mail with return receipt requested. [¶] (2) The judge receiving this written notice may forward to the parole board any unprivileged information

2280 of the California Code of Regulations, the Board has set out the procedures for a suitability hearing for "life prisoners." (See Cal. Code Regs., tit. 15, § 2000, subd. (b)(3), defining the term, "life prisoner."].) Section 2281 of the same title sets out the factors the Board considers in determining parole suitability.[9]

from the trial or sentencing proceeding regarding the prisoner, witnesses, or victims, or other relevant persons, or any other information, that is pertinent to the question of whether the parole board should grant parole or under what conditions parole should be granted. The judge may also, in his or her discretion, include information given to him or her by victims, witnesses, or other persons that bear on the question of the prisoner's suitability for parole. [¶] (3) The parole board shall review and consider all information received from the judge or any other person and shall consider adjusting the terms or conditions of parole to reflect the comments or concerns raised by this information, as appropriate. [¶] (g) Nothing in this section shall be construed as limiting the type or content of information the judge or any other person may forward to the parole board for consideration under any other provision of law."

[9] California Code of Regulations, title 15, section 2280, provides, as follows: "A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing. At this hearing, a parole date shall be denied if the prisoner is found to be unsuitable for parole under [§] 2281(c). A parole date shall be set if the prisoner is found to be suitable for parole under [§] 2281(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude in respect to the threat to the public. In setting the parole date, the panel shall consider the Sentencing Rules for the Superior Courts as they specifically relate to life prisoners. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation."

California Code of Regulations, title 15, section 2281, states the following:

"(a) General. The panel shall first determine whether a prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

"(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

"(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include: [¶] (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶]

We review the superior court's decision and the contentions of the parties in light of the materials that were properly before that court. Because the superior court's findings are based solely upon documentary evidence, we independently review the record. (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

In *Rosenkrantz, supra*, 29 Cal.4th 616, the leading case on the standard of judicial review, the California Supreme Court held that "the judicial branch is authorized to review the factual basis of a decision of the Board [determining parole suitability and setting a parole date] in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Id.* at p. 658.) The standard of judicial review is the same whether we are reviewing the decision by the Board finding a prisoner unsuitable for parole, or we are reviewing the decision by the Governor reversing a Board decision of suitability and the setting of a parole date. (*Ibid.*)

Concerning the "some evidence" standard, the court in *Rosenkrantz* explained, "Only a modicum of evidence is required." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Board. The precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the Board's discretion, but the decision

---

(E) The motive for the crime is inexplicable or very trivial in relation to the offense. [¶] (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age. [¶] (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others. [¶] . . . [¶] (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

"(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include: [¶] (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims. [¶] (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others. [¶] (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense. [¶] (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time. [¶] . . . [¶] (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime. [¶] (7) Age. The prisoner's present age reduces the probability of recidivism. [¶] (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. [¶] (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."

must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Board's decision "reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision." (*Rosenkrantz, supra,* at p. 677.)

Further, the court in *Lee* explained that the "some evidence" test is not an inquiry into whether some evidence supports the reasons the Board cites for denying parole. Rather, we ask "whether some evidence indicates a parolee's release unreasonably endangers public safety. [Citations.] Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (*In re Lee, supra,* 143 Cal.App.4th at p. 1408, fn. & italics omitted.)

■ In *Rosenkrantz,* the Supreme Court explained that a denial of parole can be based upon the nature of the commitment offense alone. (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.) The court cautioned, however, that "a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. . . .' [Citation.] 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' " (*Rosenkrantz, supra,* at p. 683.)

■ In *In re Dannenberg* (2005) 34 Cal.4th 1061, 1094 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*), the Supreme Court also mentioned that in *Rosenkrantz,* the court had warned that the "sole reliance on the commitment offense might, in particular cases, violate section 3041, subdivision (a)'s provision that a parole date 'shall normally be set' under 'uniform term'

principles, and might thus also contravene the inmate's constitutionally protected expectation of parole." The court said, "We explained that such a violation could occur, 'for example[,] where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.' (*Rosenkrantz, supra*, 29 Cal.4th 616, 683.) Quoting [*In re*] *Ramirez* [(2001)] 94 Cal.App.4th 549, 570 [114 Cal.Rptr.2d 381], we suggested that, in order to prevent the parole authority's case-by-case suitability determinations from swallowing the rule that parole should 'normally' be granted, an offense must be 'particularly egregious' to justify the denial of parole. (*Rosenkrantz, supra*, at p. 683.)" (*Dannenberg, supra*, at pp. 1094–1095.)

The court in *Rosenkrantz* rested its decision on the requirements of the due process clause in the state Constitution. (*Rosenkrantz, supra*, 29 Cal.4th at p. 658, fn. 12.) However, we are also guided by the United States Supreme Court decision in *Superintendent v. Hill* (1985) 472 U.S. 445 [86 L.Ed.2d 356, 105 S.Ct. 2768] (*Hill*). That court considered the standard of judicial review for a prison disciplinary board's revocation of good time credits. It held that procedural due process is satisfied where there is "some evidence" to support the findings made during a prison disciplinary hearing. (*Id.* at p. 457.) The court explained that "[t]he fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact. Revocation of good time credits is not comparable to a criminal conviction, [citation], and neither the amount of evidence necessary to support such a conviction, [citation], nor any other standard greater than some evidence applies in this context." (*Id.* at p. 456; see *Rosenkrantz, supra*, 29 Cal.4th at pp. 656–658, 660–661.)[10]

---

[10] In *In re Scott, supra*, 133 Cal.App.4th at page 590, footnote 6 (*Scott*), that court said: "As noted in *Rosenkrantz, supra*, 29 Cal.4th at page 656, the 'some evidence' test has its roots in *In re Powell* (1988) 45 Cal.3d 894 [248 Cal.Rptr. 431, 755 P.2d 881] and [*Hill, supra,*] 472 U.S. 445 . . . . *Powell* held that, in rescinding a parole release date, the Board does not abuse its discretion 'when it has some basis in fact for its decision' (*Powell*, at p. 904), and *Hill* required 'some basis in fact' and 'some evidence' to support a disciplinary board revocation of good time credits. ([*Hill*], at p. 456.) Therefore, as applied in *Rosenkrantz*, the 'some evidence' test may be understood as meaning that suitability determinations must have some rational basis in fact." The *Scott* court commented on sole reliance on the commitment offenses: "The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair (*In re Smith* (2003) 114 Cal.App.4th 343, 372 [7 Cal.Rptr.3d 655]), and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' (*Biggs v. Terhune* [(2003)] 334 F.3d [910,] 917.) The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. (*Irons v. Warden*, [*supra,*] 358 F.Supp.2d [at p.] 947, fn. 2.) Thus,

Considering the "some evidence" standard of review set out in *Rosenkrantz*, *Lee*, and *Hill*, we conclude that the superior court erred by reversing the Board's decision. The People argue that Court of Appeal decisions, such as *Scott, supra*, 133 Cal.App.4th 573, *In re Elkins, supra*, 144 Cal.App.4th 475 (*Elkins*), and *In re Lee, supra*, 143 Cal.App.4th 1400, were incorrectly decided insofar as they amplify the "some evidence" standard of review set out in *Rosenkrantz, supra*, 29 Cal.4th 616. We do not need to reach that issue, however. We have concluded that regardless of whether we apply the standard of review in *Rosenkrantz* alone, or view the standard of review more expansively, we reach the same conclusion.

The facts here are undisputed. The only issue is the legal conclusion to be drawn from the record. The parties agreed that Hyde had been free of "CDC 115's" since 1991 and free of minor disciplinary infractions since 1995. Hyde had obtained over 60 units of college credit, had obtained expertise in computer services, woodworking, and the paint shop. He had attended all the self-help classes available, and was a positive and perhaps notable participant in his institution's training programs, activities and organizations, and had positive chronos from the training supervisors and prison staff. Hyde was 18 years old when he committed the offenses, and 33 years had elapsed from the commission of the 1972 and 1973 crime spree. Fourteen years had elapsed from his 1990 conviction of a dangerous weapon offense. He had been eligible for parole for 19 years. Nevertheless, we agree with the Board's assessment that based on the gravity, or timing and gravity of his offenses, public safety required a more lengthy period of confinement.

"Some evidence" supports the Board's decision. (*Rosenkrantz, supra*, 29 Cal.4th at p. 616.) In 1973 Hyde committed multiple offenses of robbery, in one of which he shot a 63-year-old shoe repair business owner, a man who undoubtedly was no threat to Hyde. Three of the robberies during the crime spree involved multiple victims. During the spree, Hyde not only murdered the elderly shoe repair owner, he also assaulted an unresisting female gas station attendant, callously shooting her twice, once in the torso and then in the leg, for some inexplicable reason. Using his handgun, he verbally

---

denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny. '[T]he gravity of the commitment offense or offenses alone *may* be a sufficient basis for denying a parole application, *so long as the Board does not fail to consider all other relevant factors*.' (*In re Ramirez, supra*, 94 Cal.App.4th at p. 569, latter italics added; accord, *Rosenkrantz, supra*, 29 Cal.4th at pp. 660, 677; [*In re Scott* (2004)] 119 Cal.App.4th [871,] 891 [15 Cal.Rptr.3d 32].)" (*Scott*, 133 Cal.App.4th at pp. 594–595, fns. omitted.) Relying on *Scott, supra*, 133 Cal.App.4th 598, the court in *Elkins, supra*, 144 Cal.App.4th at page 497, said that "it violates due process to deny parole ' "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." ' " As part of its statement of the standard of judicial review, the *Elkins* court also relied on the passage quoted above from *Scott*. (*Elkins*, at pp. 495–496.)

threatened two victims during the Bill's Bike Shop robbery. Undeterred by having engaged in the two shootings, one involving death and the other involving the intentional infliction of great bodily injury, he continued committing robberies with the firearm. The robberies were calculated and grave because of their number and the numbers of his victims. They were particularly egregious because from time to time, for no rational reason, Hyde had injured or killed his victims by callously shooting them with the handgun.

Also, while in prison, Hyde was convicted of another criminal offense that the Board could properly regard as an offense of violence. In 1990 Hyde was found in possession of a piece of aluminum that he had fashioned into a 15-inch stabbing instrument, which in effect was a handmade dirk or dagger. The logical conclusion that arises from his possession of the weapon is that Hyde was contemplating committing an assault on a guard or fellow prisoner, an assault that easily could have been lethal.

The Board properly concluded that these crimes went beyond the minimum necessary to commit the offenses, and the fashion in which the offenses were committed was cruel and callous, calculated, and demonstrated an exceptional disregard for human suffering. Hyde's motive for the robbery spree was admittedly trivial in comparison to the crimes' gravity. (Cal. Code Regs., tit. 15, § 2281, subd. (c)(1)(A), (B), (C), (D) & (E), (c)(2), (6).) The Board's finding that Hyde's conduct was "particularly heinous, atrocious or cruel" (*In re Lee, supra*, 143 Cal.App.4th 1400, 1409) is supported by "some evidence" in the record (*Rosenkrantz, supra*, 29 Cal.4th at p. 677).

The superior court found insufficient evidence to support the Board's decision because it concluded that the remoteness of the 1972 to 1973 crimes rendered these offenses an unreliable indicator of future dangerousness. On appeal, Hyde argues that his commitment offenses were over 33 years old and thus had become stale insofar as they constituted reliable evidence of dangerousness. He also urges that because the one factor supporting the Board's decision was not supported by the record, the Board's decision additionally fails to reflect the required individualized consideration of the criteria established by law, and for that reason, the Board's decision was arbitrary and capricious.

We disagree. Hyde's crimes are collectively so grave that we cannot find their remoteness has resulted in a loss of reliability as predictors of future dangerousness. Furthermore, even if we agreed that the 1972 to 1973 offenses were too remote in time to be reliable, the superior court here also erred because it failed to consider Hyde's 1990 conviction, which undermines any claim of remoteness. (See *People v. James* (1978) 88 Cal.App.3d 150, 156

[151 Cal.Rptr. 354] [for purposes of the admissibility of impeachment, the prior conviction was not remote in time as the defendant had not led a "legally blameless life" following that conviction].) When the 1990 commitment offense is considered, Hyde's history of violence has considerably more temporal proximity. The 1990 offense renders the 1973 offenses considerably more probative in supporting a conclusion of an unreasonable risk of danger to society than if the 1972 to 1973 offenses are considered in isolation.

Moreover, the Board recited all the evidence it considered in reaching a decision. Its comments indicate that it properly considered all the relevant factors to suitability and that it gave Hyde the individualized decision to which he was entitled. Thus, the Board's conclusion of an unreasonable risk of danger to society did not fail to show that the Board considered all relevant factors in accordance with the legal standards for determining suitability. (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.)

The federal Constitution does not require a different result. *Hill, supra*, 472 U.S. 445, which is the only federal decision that is binding on this court, requires the same "some evidence" review set out in *Rosenkrantz. (People v. Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704] [decisions of the lower federal courts interpreting federal law are not binding on state courts].) According to the Ninth Circuit, the "some evidence" standard is also settled federal law for reviewing California's parole suitability determinations. (*Sass v. California Bd. of Prison Terms* (9th Cir. 2006) 461 F.3d 1123, 1129 (*Sass*).) In any event, all the court in *Biggs v. Terhune, supra*, 334 F.3d at page 915, held was that "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process." (*Irons v. Carey* (9th Cir. 2007) 479 F.3d 658, 665, citing *Biggs, supra*, at p. 917.) The principle was not applied in *Biggs. (Biggs, supra*, at p. 916.) The court in *Sass, supra*, 461 F.3d at page 1129, acknowledged the principle in *Biggs*, but it also declined to apply the principle there and further commented that it was not a court's "function to speculate about how future parole hearings could proceed." The court in *Irons v. Carey, supra*, 479 F.3d 658, again declined to apply the principle and held that given the circumstances before it, those prisoners could not be deemed "unsuitable for parole prior to the expiration of their minimum terms." (*Id.* at pp. 664–665; see also *Eccher v. Mendoza-Powers* (E.D.Cal., Mar. 20, 2000, No. CIVS-03-0020) 2007 U.S.Dist. Lexis 19701 [explaining the federal law and concluding that the state of the federal law on this point was uncertain].)

■ Based on the evidence in the record, Hyde's commitment offenses constitute a reliable indicator that Hyde presents an unreasonable risk of danger to the public. Accordingly, "some evidence" supports the Board's decision.

## DISPOSITION

The superior court's order of January 3, 2007, is reversed.

Doi Todd, J., and Ashmann-Gerst, J., concurred.

The petition of respondent Paul Hyde for review by the Supreme Court was denied December 12, 2007, S156291.