[No. B188831. Second Dist., Div. Eight. Oct. 17, 2006.]

In re WEN LEE on Habeas Corpus.

## Counsel

Roger S. Hanson; Law Offices of Michael Satris and Michael Satris for Petitioner Wen Lee.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Heather Bushman and Amanda Lloyd, Deputy Attorneys General, for Respondent The People of the State of California.

## Opinion

**RUBIN, J.**—Petitioner Wen Lee seeks a writ of habeas corpus ordering his release on parole after Governor Arnold Schwarzenegger reversed the Board of Parole Hearings' recommendation to grant him parole. We grant the writ and order his release.

## FACTS AND PROCEDURAL HISTORY

In 1989, Wen Lee pleaded guilty to second degree murder and attempted premeditated murder. Because there was no trial ending in a verdict, we rely on the probation report for the details of his crimes.

Sometime around 1987, Wen Lee sold his restaurant to Johnny Soong in return for Soong's promise to make periodic payments toward the purchase price. Lee intended to support his retirement from the sale proceeds. Soong repeatedly failed to make payments, however, causing Lee hardship and forcing him to renegotiate Soong's debt a number of times. Some renegotiation meetings were heated. During one meeting, Soong pulled a knife on Lee, forcing Lee to flee.

The next time Lee visited Soong at the restaurant to collect a payment, Lee went armed with a gun and box of ammunition. He had decided that, if Soong refused to pay, he would kill Soong and then himself. Lee entered the restaurant and asked Soong for his money. Soong shook his head and said he did not have time to talk. Lee pulled out his gun and fired five times before it jammed. He hit Soong twice, who survived the shooting, but one of the bullets hit Soong's wife, Tuai Li-Chun, in the head, killing her.

Lee pleaded guilty to attempted premeditated murder of Soong, second degree murder of Mrs. Soong and two firearm enhancements. In 1989, the trial court sentenced Lee to state prison for 17 years to life with the possibility of parole for murder, and life with the possibility of parole for attempted premeditated murder.

Nearly 16 years later, in January 2005, Lee had a parole hearing before the Board of Parole Hearings (hereafter board).[1] At the hearing, the board concluded that Lee would not pose an unreasonable risk of danger to public safety if he were released. The board therefore concluded Lee was eligible for parole. In support of its decision, the board cited multiple factors. They included Lee's lack of a criminal record before his crimes against the Soongs; his excellent behavior in prison, including his effort to improve himself through prison education and the absence of any discipline for misconduct; his advanced age of 81 years and poor health, including difficulty walking,

---

[1] Apparently, this was his sixth hearing. He had appeared before the board five times between 1997 and 2003, but each time the board found him unsuitable for parole.

hypertension, diabetes, increasing renal failure, and cardiovascular disease; his mental health evaluations showing "little risk of recidivism" and "very low risk of violence in the community"; his realistic plans for supporting himself outside prison by living with his family; and finally, his signs of remorse and acceptance of responsibility for his crimes.

The board's recommendation went to the Governor for his review. In June 2005, he reversed the board. He acknowledged the many factors the board cited in support of parole, but concluded Lee was nevertheless ineligible for two reasons. First, the Governor viewed Lee's acts in committing his crimes as "atrocious" and beyond the "the minimum necessary to sustain" his convictions. Second, Lee had accepted responsibility for his crimes less than one year earlier in late 2004, which the Governor concluded was too recent to "tip[] the scale in his favor"; up to then, the Governor noted, Lee had claimed he shot Soong in self-defense and denied shooting Mrs. Soong at all.

Lee filed in superior court a petition for writ of habeas corpus. The superior court found the record contained "some evidence" to support the Governor's decision that Lee was unsuitable for parole. The court thus dismissed the petition. Lee then filed a petition for writ of habeas corpus in this court, which we summarily denied in March 2006.

Lee thereafter filed a petition for review by our Supreme Court. In June 2006, the Supreme Court granted review and transferred the case to us with an order to vacate our summary denial. It also ordered us to issue to the Director of Corrections and Rehabilitation an order to show cause why the Governor did not abuse his discretion in reversing the board's finding that appellant was suitable for parole, why "some evidence" in the record supports the Governor's determination, and why Lee is not entitled to release on parole. We issued the order and set the matter for argument.

## DISCUSSION

1.  *The Board Grants Parole*

A defendant sentenced to an indeterminate life term is normally entitled to parole if the board finds he does not pose an unreasonable risk to public safety. (Pen. Code, § 3041, subd. (a).) California Code of Regulations, title 15, section 2402 establishes the "general guidelines" for determining

whether a defendant poses such a danger. Section 2402 sorts the factors relevant to assessing a defendant's risk into two categories: those that tend to show *unsuitability* for parole, such as an especially atrocious crime by the defendant and a history of violence; and those factors that tend to show *suitability*, such as lack of a criminal history, good prison behavior, and remorse.[2]

At Lee's parole hearing, the board found every factor supported his suitability for parole. He was born in 1924 and, until his crimes against the Soongs when he was 65 years old, had no prior criminal history. He acknowledged his guilt by having entered into the plea bargain that sent him to prison for 17 years to life. At his parole hearing, he reiterated, "I admit that I was wrong and I don't want to recall but everyday I confess to the Lord

---

[2] Factors tending to show *unsuitability* are: "(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense. [¶] (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age. [¶] (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others. [¶] (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim. [¶] (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense. [¶] (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail." (Cal. Code Regs., tit. 15, § 2402.)

Factors tending to show *suitability* are: "(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims. [¶] (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others. [¶] (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense. [¶] (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time. [¶] (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization. [¶] (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime. [¶] (7) Age. The prisoner's present age reduces the probability of recidivism. [¶] (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. [¶] (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (Cal. Code Regs., tit. 15, § 2402.)

because I'm so painful inside my heart. I'm so sorry because I did wrong to the Soong husband and wife and also to the government of California."

In addition, while serving his prison sentence, Lee had a spotless discipline record except for one smoking violation in 1998. He also improved himself by taking adult education classes, including English as a second language. Every prison psychological evaluation of him, stretching back more than a decade, found he posed little, or no, danger to public safety if released. A 1992 report described him as harboring "less of a risk of violence than the average inmate." His 1997 evaluation stated it was "likely that his potential for repeating a violent crime is exceptionally low[,]" and a report in 1999 stated his risk was in the "very low range." A 2003 evaluation noted Lee's nature as "consistently a very low level of risk for future violence." And the most recent report prepared in November 2004 for Lee's January 2005 parole hearing found "a very low risk of violence to the community," reinforced by his deteriorating health and limited physical capabilities.

Lee's health problems were numerous, resulting in his total disability. He suffered from diabetes and high blood pressure. His left eye was blind and he had blurred vision in his right. He could not get around easily and often required assistance. Lee's healthcare providers noted that although he was not likely to die within six months, which would entitle him to compassionate release, they believed he "wouldn't live more than a year in his current conditions the way that they are and they don't believe that there's anything that they can do to assist him in that process."

Finally, the board noted, Lee had realistic plans for the short time remaining to him after his release. The Immigration and Naturalization Service had placed a hold on him as a deportable alien. If ordered deported, he was willing to accept voluntary deportation and return to his Chinese homeland to live with his brother. If, on the other hand, he were allowed to remain in the United States, he planned to live with his son.

2. *The Governor Reverses the Board*

In reviewing the board's decision, the Governor must consider the same factors as the board. (Cal. Const., art V, § 8, subd. (b); *In re Rosenkrantz* (2002) 29 Cal.4th 616, 676 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) The Governor did so here and accepted the factual underpin-

nings of the board's findings. He noted, for example, that Lee had no criminal record other than his crimes against the Soongs, had no history of substance abuse, and had been discipline-free while in prison. The Governor acknowledged Lee's efforts to improve himself in prison through adult education and English language classes. The Governor also noted Lee's poor health, realistic plans for himself after parole, and supportive family. Finally, the Governor also observed that "mental-health professionals have assessed his current potential for violence . . . as being low and indicate there is little risk of recidivism due to his age, health problems, and maturity."

Although the Governor must consider the same factors as the parole board, he may weigh those factors differently than did the board. (Cal. Code Regs., tit. 15, § 2402, subds. (c) & (d).) Thus, he has the discretion to be "more stringent or cautious" in determining whether a defendant poses an unreasonable risk to public safety. (*Rosenkrantz, supra,* 29 Cal.4th at p. 686.) Here, the Governor exercised his discretion to reverse the board despite his agreement with its other findings. In doing so, he cited two reasons. First, Lee's crimes were, in the Governor's view, "atrocious," involving more than the minimum conduct needed to commit his offenses. Second, Lee's admission of culpability was too recent to count much in the Governor's estimation.

■ The Attorney General argues that so long as "some evidence," which may be as little as a "modicum," supports the Governor, we must affirm. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 676–677; see *In re Smith* (2003) 114 Cal.App.4th 343, 361 [7 Cal.Rptr.3d 655]; *In re McClendon* (2003) 113 Cal.App.4th 315, 321 [6 Cal.Rptr.3d 278].) We conclude, however, that the Governor erred. The test is not whether some evidence supports the *reasons* the Governor cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety*.[3] (Cal. Code Regs.,

---

[3] Courts show great deference to the Governor in determining whether some evidence exists. Since voters in 1988 enacted article V, section 8, subdivision (b) of the state Constitution empowering the Governor to review the board's decisions, we know of only two cases that have overturned a Governor's reversal of the board's granting of parole and ordered a prisoner's release. One was *In re Scott* (2005) 133 Cal.App.4th 573 [34 Cal.Rptr.3d 905], which involved a then 64-year-old defendant with no significant criminal history who 18 years earlier murdered his wife's lover who supported the wife's drug addiction by giving her drugs. The *Scott* court aptly described the murder as happening under extreme "stress caused by an unusual combination of circumstances unlikely to recur." (*Id.* at pp. 579–580, 601.)

The second was *In re Smith* (2003) 109 Cal.App.4th 489 [134 Cal.Rptr.2d 781]. The appellate court's task in *Smith* was largely driven by the Governor's numerous misconceptions about Smith and his offense. The Governor's statement denying parole stated, for example, that Smith and an accomplice beat and shot their murder victim before dragging him to a creek where they held him underwater until he drowned; in fact, Smith did not beat, drag, or drown the victim. (*Smith,* at p. 504.) The statement also said Smith was convicted of second degree murder while armed with a firearm; in fact, he was convicted of second degree murder while a

tit. 15, § 2402, subd. (a) [parole denied if prisoner "will pose an unreasonable risk of danger to society if released from prison"]; see, e.g., *In re Scott* (2005) 133 Cal.App.4th 573, 595 [34 Cal.Rptr.3d 905] ["The commitment offense can negate suitability [for parole] only if circumstances of the crime . . . rationally indicate that the offender will present an unreasonable public safety risk if released from prison"]; but see *In re Lowe* (2005) 130 Cal.App.4th 1405 [31 Cal.Rptr.3d 1] [suggested "some evidence" applies to the factors, not dangerousness].) Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.[4]

█ We must therefore view the Governor's two reasons within the context of the other factors he must consider to see if some evidence shows Lee continues to pose an unreasonable risk to public safety. (*In re Scott, supra,* 133 Cal.App.4th at pp. 594–595.) Applying that test, we find no evidence that Lee is likely to commit another crime or that his release would unreasonably endanger the public. Like the Governor, we do not minimize the seriousness of Lee's offenses 19 years ago, for which society has legitimately punished him. No reasonable possibility exists, however, that Lee will reoffend. Other than his offenses here, he has led a crime-free life. The dispute over the restaurant debt that motivated the shootings occurred almost 20 years ago. Weakened by the march of time trod by all mortals, Lee is now 82 years old and in poor health, leaving him to hobble from room to room. The two reasons the Governor cites—the nature of Lee's crimes and recent acceptance of responsibility—do not change those facts. We conclude the Governor's reversal of the board's decision is therefore not supported by some evidence.

### 3. *The Governor's First Reason for Denying Parole: Nature of Lee's Crimes*

█ The first factor the Governor cited for Lee's unsuitability for parole was the crimes themselves, which the Governor characterized as "atrocious." The Governor may deny parole if a defendant committed his crimes "in an *especially* heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1), italics added.) Notwithstanding the Governor's description of Lee's crimes, they were not "atrocious"—or at least were no more atrocious than whenever one human being kills another—and were not

---

principal was armed, there being no evidence he was himself personally armed. By the *Smith* court's count, the Governor's statement contained at least seven more clear factual errors in addition to the two we have highlighted.

[4] For example, a seriously troubled adolescence, even for an 80-year-old inmate, might constitute "some evidence" of "a history of unstable or tumultuous relationships with others." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(3).) It would not necessarily be some evidence of an unreasonable danger to public safety.

committed "in an especially heinous, atrocious or cruel manner." The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious. (See *In re Scott* (2004) 119 Cal.App.4th 871, 891 [15 Cal.Rptr.3d. 32] [" '[A]ll second degree murders by definition involve some callousness—i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others' "].) Rather, the inquiry is whether among murders the one committed by Lee was particularly heinous, atrocious or cruel. (*In re Ramirez* (2001) 94 Cal.App.4th 549, 570 [114 Cal.Rptr.2d 381], disapproved on another point by *In re Dannenberg* (2005) 34 Cal.4th 1061, 1082–1083, 1100 [23 Cal.Rptr.3d 417, 104 P.3d 783].) By that measure, Lee's crimes were more commonplace than egregious.

Comparing Lee to defendants for whom the board or Governor properly denied parole because the defendant's crimes were atrocious is illuminating.

—In *Rosenkrantz*, the defendant " 'brutally murdered' his victim after 'a full week of careful preparation, rehearsal and execution.' " The defendant killed his victim by firing "10 shots at close range from an assault weapon and [firing] at least three or four shots into the victim's head as he lay on the pavement." (*Rosenkrantz, supra*, 29 Cal.4th at p. 678.)

—In *In re Dannenberg, supra*, 34 Cal.4th at page 1095, the defendant "reacted with extreme and sustained violence," striking "multiple blows to his wife's head with a pipe wrench." While she was helpless from her injuries, he delivered the coup de grace by placing her head "into a bathtub full of water, . . . or at least left it there without assisting her until she was dead." (*Ibid.*)

—In *In re McClendon* (2003) 113 Cal.App.4th 315 [6 Cal.Rptr.3d 278], the defendant planned a "calculated attack" in the "middle of the night" against his estranged wife. He arrived at her home wearing rubber gloves and carrying a handgun and wrench, which he used to attack his wife and another victim. (*Id.* at pp. 321–322.)

—In *In re Burns* (2006) 136 Cal.App.4th 1318 [40 Cal.Rptr.3d 1], the defendant and murder victim were longtime friends who had been dating. When the victim moved away to college, she told the defendant she wanted to stop seeing him. The court described her last hours alive as follows: "[A]fter luring Katina to an isolated spot and shooting her, [defendant] did not summon help or stay to help her. Instead he walked away, climbed the stairway of his dormitory building from which Katina might have been visible, and entered his dorm room where he laid down on his bed and may have joined his roommate who was watching Monday Night Football.

Meanwhile Katina, who had been shot between 7:00 and 8:00 p.m., was not found until 9:45 p.m. When found, she was lying on her back and moaning. Her body had scratches indicating that she may have tried to obtain help. Katina was not pronounced dead until after midnight. Thus, [defendant] had approximately one to two hours in which he could have reconsidered his disregard for Katina's suffering and life, but he did not do so." (*Id.* at pp. 1327–1328.)

—In *In re Van Houten* (2004) 116 Cal.App.4th 339 [10 Cal.Rptr.3d 406], the defendant participated in the "premeditated," "gratuitous mutilation" of a married couple in which the wife "was stabbed a total of 42 times" and "struggled for her life while hearing her husband meet his gruesome fate." (*Id.* at pp. 346, 351, 366.)

—In *In re DeLuna* (2005) 126 Cal.App.4th 585 [24 Cal.Rptr.3d 643], the defendant fought with the victim outside of a bar, retrieved a rifle, shot the victim in the mouth and then "deliberate[ly] stalk[ed the] defenseless victim" through the parking lot, firing at him until he died. (*Id.* at p. 593.)

—In *In re Lowe, supra,* 130 Cal.App.4th 1405, the defendant had a " 'special relationship of trust and confidence' " with the victim. He purchased a gun shortly before the murder, entered the victim's bedroom while the victim slept "and shot him five times in the head and chest, execution style." (*Id.* at p. 1414.)

—And finally, in *In re Morrall* (2002) 102 Cal.App.4th 280 [125 Cal.Rptr.2d 391], a defendant embroiled in an acrimonious divorce was a poisonous brew of "self-fostered anger." He was "angry at the prospect of being compelled to divide the community property with his wife. He was angry at the prospect of having continuing child and spousal support obligations. He was angry that his wife would have custody and thus some control over when he could see the children. He was angry that his wife would stand up for her interests in the dissolution proceedings rather than simply yield to his demands." (*Id.* at p. 300.) In the months before he murdered his wife, he threatened her a number of times, hoping to get his way in the dissolution proceedings. He told his wife's parents "that he would have his wife killed and would burn both houses before he ever gave her a dime." (*Ibid.*) Consumed by incalculable rage, he took a loaded gun to her house. The court described his wife's final moments as follows: "At first, the victim would not open her door. When she did, he shot her seven times, including a contact wound to the neck. In doing so, he consummated the life-endangering anger he had been harboring, and also deprived his young children of a mother and imposed upon them the stigma of having a murderer for a father." (*Ibid.*)

Lee's crimes do not measure against the foregoing offenses as "especially heinous, atrocious or cruel manner." They were instead much like those in *In re Smith, supra,* 114 Cal.App.4th 343. In that case, the defendant "wanted to go job hunting, but [the victim] said she had other plans. He became suspicious and very emotional, and when she further announced the [*sic*] neither she nor anyone else wanted to see him, he immediately got his gun and shot her three times in the head, presumably killing her instantly. Was the crime callous? Yes. However, are the facts of the crime some evidence that Smith acted with exceptionally callous disregard for [the victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No." (*Id.* at p. 367, fn. omitted.)[5]

██ Besides not being especially atrocious, heinous or callous, Lee's crimes have little, if any, predictive value for future criminality. Simply from the passing of time, Lee's crimes almost 20 years ago have lost much of their usefulness in foreseeing the likelihood of future offenses than if he had committed them five or 10 years ago. (*In re Scott, supra,* 133 Cal.App.4th 573, 595 [past crime's value for predicting future crime diminishes over time].) Moreover, Lee's motivation for the shooting—his desperate rage against Soong driving him toward murder and suicide—augurs against any future offenses. ██ As one court explained, a defendant's " 'motivation' for the offense tends to show *suitability* when it was 'the result of significant stress in his life, especially if the stress has built over a long period of time.' " (*Id.* at p. 596.)

██ Instead of being atrocious, Lee's conduct involved no more than was necessary to commit his crimes. (*Rosenkrantz, supra,* 29 Cal.4th at p. 683 [cannot deny parole based on nature of offenses if defendant's acts were the bare minimum needed to commit the offense].) Arguing Lee did more than the bare minimum needed for his offenses, the Attorney General observes that Lee took 15 minutes to drive to the restaurant. During that drive, the Attorney General notes, Lee had time to reflect on his intended crime and stop. The Attorney General also notes that Lee took, in addition to a gun, an extra box of ammunition. But a 15-minute drive and a box of ammunition do not make a crime especially heinous, atrocious or callous. Pondering what one is about to do is the essence of premeditation, and Lee's premeditation was not elaborate or prolonged. (Cf. *Rosenkrantz,* at p. 678 [" 'full week of careful preparation, rehearsal and execution' "]; *In re Lowe, supra,* 130 Cal.App.4th 1405 [plea bargain of second degree murder which did involve planning and premeditation].) Finally, taking a box of ammunition was inconsequential because Lee did not try to reload.

---

[5] In *In re Smith,* the Court of Appeal reversed the trial court's release of inmate Smith, but at the same time vacated the Governor's reversal of the board's release of the inmate, and allowed the Governor to reconsider his decision in light of the court's opinion. (*In re Smith, supra,* 114 Cal.App.4th at pp. 374–375.)

The Attorney General also argues that the People could have prosecuted Lee for the first degree murder of Mrs. Soong under the doctrine of transferred intent. (*People v. Shabazz* (2006) 38 Cal.4th 55, 62 [40 Cal.Rptr.3d 750, 130 P.3d 519].) Because of his plea bargain, however, he was sentenced for second degree murder for her death. According to the Attorney General, Lee's intent to kill Soong that the law "transferred" to Mrs. Soong involved conduct greater than the bare minimum needed to commit second degree murder. Thus, Lee's crime justified the Governor's decision to deny parole.

We find the Attorney General's contention unpersuasive because transferred intent, although appropriate for punishment purposes, is a legal construct that does not describe a crime's facts. We discern at least two reasons the bare minimum test properly looks to how Lee actually committed his crimes, not the possible theories of criminal liability that the People could have pleaded. First, the board and Governor must focus their parole decisions on whether a prisoner continues to pose an unreasonable risk to public safety. Such a practical inquiry, rooted in real world crime and law and order, has no obvious intersection with the incorporeal realm of legal constructs.

Second, focusing on how the People could have pled a crime, instead of how Lee committed it, risks potentially odd results. For example, if Lee had killed, instead of wounded, Soong with no more premeditation or other conduct than he exhibited here, the People could have properly charged him with two counts of first degree murder—plainly, a worse set of crimes than what he committed. Yet, against two first degree murder charges, his argument that his conduct involved no more than the minimum acts needed to commit his offenses would strengthen. As such, he would have a stronger, not weaker, claim to parole on two murder charges than he would for his actual crimes of attempted premeditated murder and murder. To avoid such an absurd result, we must apply the bare minimum test to how Lee actually committed his crimes, not to how the People could have pleaded them. Here, he did not in fact intend to kill Mrs. Soong and thus did not act in a manner beyond the minimum necessary to commit her murder. As for Soong, he acted with the premeditation required of the crime with which he was convicted.

4. *The Governor's Second Reason for Denying Parole: Late Acceptance of Responsibility*

The second reason the Governor cited for denying Lee parole was the perceived tardiness of Lee's acceptance of responsibility for his crimes. We note that Lee never denied shooting Soong, although he did temper his

acceptance of responsibility by claiming Soong had victimized him in the sale of the restaurant. We also note that in the immediate aftermath of the shootings, Lee disbelieved he had hit Mrs. Soong, insisting instead that someone else must have killed her. Nevertheless, by the time he agreed to the plea bargain, he had necessarily acknowledged his guilt for both crimes. In light of his plea, his claim in following years of not being responsible for Mrs. Soong's death makes sense only as his trying to emphasize her death was accidental, not intentional—a distinction the record supports and the People do not dispute. In any event, by the time of his last parole hearing, his acceptance of responsibility for his crimes was complete.

■ The Governor concluded Lee's acceptance was too recent to tip in his favor. To deny parole, the reason must relate to a defendant's continued unreasonable risk to public safety. So long as Lee genuinely accepts responsibility, it does not matter how long-standing or recent it is. As Justice Felix Frankfurter observed, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." (*Henslee v. Union Planters Bank* (1949) 335 U.S. 595, 600 [93 L.Ed. 259, 69 S.Ct. 290, 1949-1 C.B. 223] (dis. opn. of Frankfurter, J.).) The same can be said about responsibility and remorse. Belated claims of remorse may legitimately cause doubt about the convert's sincerity. But, as the Governor challenges only the timing, not the genuineness, of Lee's remorse, Lee's lengthy journey to assuming full responsibility is no evidence that he continues to pose an unreasonable risk to public safety.

## CONCLUSION AND DISPOSITION

All murders represent the basest form of human behavior. Our laws, however, provide for mechanisms by which even murderers, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws. The record establishes that Lee does not pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support. As the record allows only one conclusion about Lee's lack of dangerousness to the public, it serves no purpose to remand this matter to the Governor to permit him to reconsider his decision. (*In re Scott, supra,* 133 Cal.App.4th at pp. 603–604 [ordering immediate release instead of remand where no evidence supported denying parole]; *In re Smith, supra,* 109 Cal.App.4th at p. 507 [same]; cf. *Rosenkrantz, supra,* 29 Cal.4th at pp. 658, 664–666, 667–669 [remand proper to permit reconsideration of denial of parole if record does not support stated reasons for denial but other evidence overlooked in the record arguably could]; *In re Smith, supra,* 114 Cal.App.4th at pp. 374–375 [remanded matter to Governor to conduct new hearing after he relied on insufficient evidence to reverse board]; *In re Capistran* (2003) 107 Cal.App.4th 1299, 1306–1307 [132 Cal.Rptr.2d 872] [same].) Accordingly,

the petition for writ of habeas corpus is granted. The Governor's decision to reverse the board's order granting parole to Wen Lee is vacated, and the board's parole release order is reinstated.

Cooper, P. J., and Boland, J., concurred.

On November 14, 2006, the opinion was modified to read as printed above.