68 Cal.Rptr.3d 188 (2007)
156 Cal.App.4th 1387
In re John Ernest DANNENBERG, on Habeas Corpus.
No. H030031.
Court of Appeal of California, Sixth District.
November 16, 2007.
As Modified December 3, 2007.
*189 Steve Defilippis, Picone & Defilippis, San Jose, for Petitioner.
Bill Lockyer, Attorney General of the State of California, Edmund G. Brown, Jr., Attorney General of the State of California, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior *190 Assistant Attorney General, Jennifer A. Neill, Supervising Deputy Attorney, Pamela B. Hooley, Deputy Attorney General, Jessica Nicole Blonien, Deputy Attorney General, for Respondent.
MIHARA, J.
Petitioner John E. Dannenberg has been incarcerated since 1986 for the second degree murder of his wife. Although he has had numerous parole hearings, he has repeatedly been found unsuitable for parole due to the gravity of the commitment offense. In 2005, the Board of Parole Hearings (the Board) decided that Dannenberg was suitable for parole and granted him parole, but the Governor reversed the Board's decision. While the Governor conceded that every factor other than the gravity of the commitment offense favored a finding that Dannenberg is suitable for parole, he concluded that the gravity of the commitment offense alone justified an unsuitability finding. Dannenberg challenges the Governor's decision, and we conclude that it is not supported by some evidence. No evidence in the record that was before the Board supports a conclusion that, due solely to the nature of his commitment offense, Dannenberg currently poses an unreasonable risk of danger to society if released. Accordingly, we vacate the Governor's decision and reinstate the Board's decision.

I. Factual Background
The facts of the commitment offense were set forth in the California Supreme Court's 2005 opinion addressing Dannenberg's challenge to the Board's 1999 parole denial. "Dannenberg and his wife experienced severe domestic difficulties for a number of years. They had sought marriage counseling, and the victim had been seen by psychiatric personnel for complaints including violence to her and her children.
"On May 15, 1985, around 9:00 a.m., law enforcement authorities were summoned to the couple's home in Los Altos Hills. In a bathroom, they found the victim's body, draped over the side of the bathtub with her head underwater in' the tub. Dannenberg had several scratches on his body, a deep bite mark on his left middle finger, and cuts on his neck, eyelid, and face. An autopsy disclosed that the victim's body had various cuts, abrasions, and puncture wounds, consistent with being hit on numerous occasions. One of the wounds matched the markings of a half-pound pipe wrench. The autopsy report concluded that although the victim had been hit many times on the head, the cause of death was drowning.
"Dannenberg gave investigating officers the following account: Around 7:00 a.m., he was drawing a bath for his son when he noticed debris in the drain that could cause a clog. He procured a pipe wrench and a screwdriver to fix a leaky toilet valve. 'During this time[,] he evidently said something to his wife' about the drain. She came into the bathroom and picked up the screwdriver. A heated argument ensued. Screaming that she "wanted him dead,' the victim jabbed the screwdriver at Dannenberg, cutting his arm, and clawed and scratched his forearm with her fingernails. Dannenberg first tried to defend himself with his bare hands. Then he picked up the pipe wrench and hit the victim once on the side of the head. When she continued to advance on him, he `hit her a couple more times on the head,' and she fell to the floor. Dannenberg himself collapsed 'and may have passed out.'" (In re Dannenberg (2005) 34 Cal.4th 1061, 1072-1073, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Dannenberg).)
*191 "After that, he remembered nothing until he saw the victim lying on the edge of the tub. A pool of blood covered the floor where she had previously lain. There was also considerable blood on her head, and smeared on the wall. Dannenberg could not move at first, because his legs, curled underneath him, were asleep. From his low position, and in a dazed condition, he did not notice the victim's head was in the water. Eventually he reached over and tried to take her pulse, but could not feel anything. He then struggled to his feet, went to his bedroom, and called 911. The fire department responded within a few minutes but determined that the victim was dead and did not try to resuscitate her." (Dannenberg, supra, 34 Cal.4th at p. 1073, 23 Cal.Rptr.3d 417, 104 P.3d 783.) "Exactly how [his wife drowned] is unclear. However, despite Dannenberg's insistent denials, the circumstances permit an inference that, while she was helpless from the beating, Dannenberg placed or forced her head under water, or at least allowed it to remain there, until she died." (Dannenberg, at p. 1069, 23 Cal.Rptr.3d 417,104 P.3d 783.)

II. Judicial Proceedings
Dannenberg was convicted by a jury of second degree murder, and committed to state prison for a term of 15 years to life. He has been incarcerated since October 1986. His minimum parole eligibility date was June 25, 1996. (Dannenberg, supra, 34 Cal.4th at p. 1072, 23 Cal.Rptr.3d 417, 104 P.3d 783.)
Dannenberg was found unsuitable for parole at parole hearings in 1994 and 1997. (Dannenberg, supra, 34 Cal.4th at p. 1072, 23 Cal.Rptr.3d 417, 104 P.3d 783.) In 1999, the Board again found Dannenberg unsuitable for parole. It based its unsuitability finding on the gravity of the commitment offense, and Dannenberg's need for more "`therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner.'" (Dannenberg, at pp. 1074-1075, 23 Cal.Rptr.3d 417, 104 P.3d 783.) Dannenberg filed a habeas petition in the Marin County Superior Court challenging the Board's 1999 decision, and his habeas petition was granted. The Marin County Superior Court found that there was "no evidence that Dannenberg's crime was callous and cruel, or indifferent to human suffering, beyond any and all second degree murders." (Dannenberg, at p. 1076, 23 Cal.Rptr.3d 417, 104 P.3d 783.) The court ordered the Board to hold a new parole hearing at which it would be expected to set a parole date unless there was additional evidence presented or a change of circumstances. (Ibid.) The Board appealed. While the Board's appeal was pending, the Board, at Dannenberg's 2001 parole hearing, again found him unsuitable for parole.
In 2002, the First District Court of Appeal filed an opinion reversing in part and affirming in part the Marin County Superior Court's decision. It concluded that "when determining a life prisoner's parole suitability, the Board must first compare his or her crime against other similar offenses of the same class, taking into account the minimum term to which the inmate was sentenced. The Board may not continue to find an inmate unsuitable under section 3041, subdivision (b), without considering whether the term he or she is serving is disproportionate to the seriousness of the commitment offense, and to the terms served for other similar crimes. The commitment offense will justify a finding of unsuitability only if it is particularly egregious by these standards. [The First District concluded that t]he Board erred by failing to conduct such a comparative analysis before finding Dannenberg unsuitable." (Dannenberg, supra, 34 Cal.4th at p. 1076, 23 Cal.Rptr.3d 417, 104 P.3d 783.) *192 It ordered a new parole hearing at which such a comparison would be done.
The California Supreme Court granted review of the First District's decision "limited to" the question of "whether the Board may refuse a parole date [based solely on the gravity of the offense] only after evaluating the offender's crime against others of similar gravity and against its own uniform-term `matrices,' and concluding that the offense is particularly egregious by those comparative standards, or whether it need conduct such a comparative analysis only after it determines that the inmate is suitable for parole." (Dannenberg, supra, 34 Cal.4th at pp. 1069, 1077, 23 Cal.Rptr.3d 417, 104 P.3d 783.)
In January 2005, the California Supreme Court reversed the First District in a 4-3 decision. (Dannenberg, supra, 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783.) It held that the Board is not required to conduct a comparative analysis before determining parole suitability. The California Supreme Court also clarified that a crime may be considered particularly egregious if the Board identifies "factors beyond the minimum elements of the crime for which the inmate was committed." (Dannenberg, at p. 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783.) "Here the Board's conclusion that Dannenberg remains too dangerous for parole because his offense was especially callous and cruel, and was committed for a trivial reason, relied upon facts beyond the minimum elements of second degree murder, and was supported by some evidence. The Board's decision to deny parole thus comports with the law." (Ibid.)
"Here, as in Rosenkrantz, the parole authority pointed to circumstances of the inmate's offense suggesting viciousness beyond the minimum elements of second degree murder. As the Board noted, Dannenberg reacted with extreme and sustained violence to a domestic argument. He struck multiple blows to his wife's head with a pipe wrench. Bleeding profusely, she then `fell or was pushed' into a bathtub full of water, where she drowned. Though he vehemently denied it, the evidence permitted an inference that, while the victim was helpless from her injuries, Dannenberg placed her head in the water, or at least left it there without assisting her until she was dead....
"Thus, there clearly was `some evidence' [citation] to support the Board's determination that Dannenberg's crime was `especially callous and cruel,' showed 'an exceptionally callous disregard for human suffering,' and was disproportionate to the `trivial' provocation. Accordingly, under Rosenkrantz, the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date." (Dannenberg, supra, 34 Cal.4th at p. 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783.)
Between the 2001 decision by the Board finding Dannenberg unsuitable for parole and the California Supreme Court's 2005 decision, Dannenberg waived parole hearings. After the California Supreme Court's January 2005 decision, the Board[1] again considered whether to grant Dannenberg parole. Dannenberg did not discuss the facts of the offense at this parole hearing. The Board concluded that Dannenberg was suitable for parole, calculated his term, and set a parole date.
*193 The Governor reversed the Board's grant of parole. The Governor's decision expressly conceded that every factor other than the nature of the commitment offense favored Dannenberg's release on parole. "[Mr. Dannenberg] has no previous criminal history. And since his imprisonment, Mr. Dannenberg has maintained a blemish-free conduct record and has worked to enhance his ability to function within the law upon release. He has taken several college-level courses and has held skilled jobs such as Law Librarian, Custody Captain's Clerk, and Electronics Maintenance. He has availed himself of an array of self-help and therapy, including Alternatives to Violence, Advanced Alternatives to Violence, Breaking Barriers, and Advanced Breaking Barriers. He also has published more than 300 articles in Prison Legal News, has officiated Jewish sabbatical services, and has participated in the Men's Advisory Council. He has received favorable reports from various correctional and mental-health professionals, has maintained seemingly solid relationships with family while in prison, and has made realistic, confirmed plans upon parole to live with long-time friends and resume a career in the engineering field, in which he worked before the murder. These are all factors supportive of Mr. Dannenberg's release from prison to parole."
Dannenberg sought habeas relief in the Santa Clara County Superior Court. The superior court denied his petition in March 2006. "Petitioner's procedural challenges have been rejected in In re Rosenkrantz (2002) 29 Cal.4th 616[, 128 Cal.Rptr.2d 104, 59 P.3d 174]. And Petitioner's factual challenges have been rejected in In re Dannenberg (2005) 34 Cal.4th 1061[, 23 Cal.Rptr.3d 417, 104 P.3d 783]. [¶] Pursuant to the California Supreme Court's analysis and decision in this case, there will always be some evidence that the crime is more than the minimum necessary for the second degree murder conviction and this will always be enough to deny Petitioner parole for his second degree murder conviction." The court invited Dannenberg to contend that his offense was not especially egregious for a "first degree murder" and therefore that he should be released on parole because he had served enough time "within the matrix for first degree murder."
Dannenberg filed the instant petition for habeas relief in this court in April 2006.[2] We issued an order to show cause in May 2007, and the Governor filed a return in July 2007. Dannenberg filed his reply in July 2007, and we granted his motion for calendar preference and placed the matter on calendar for oral argument.

III. Discussion

A. Standard of Review
"[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but ... in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter *194 to proceed in accordance with due process of law." (In re Rosenkrantz (2002) 29 Cal.4th 616, 658, 128 Cal.Rptr.2d 104, 59 P.3d 174 (Rosenkrantz).)
The same standard of review applies to a decision by the Governor that reverses a Board decision finding a prisoner suitable for parole. (Rosenkrantz, supra, 29 Cal.4th at p. 667, 128 Cal.Rptr.2d 104, 59 P.3d 174.) "[A] parole decision by the Governor ... [must] be based upon the same factors the Board is required to consider. Due process of law requires that this decision be supported by some evidence in the record. Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (Rosenkrantz, at pp. 676-677, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.)

B. Parole Suitability and Unsuitability Criteria
The general standard for a parole unsuitability decision is that "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the [Board or the Governor] the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal.Code Regs., tit. 15, § 2402, subd. (a) (Regs)[3].)
"[Circumstances tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal.Code Regs., tit. 15, § 2402, subd. (c).)" (Rosenkrantz, supra, 29 Cal.4th at pp. 653-654, 128 Cal.Rptr.2d 104, 59 P.3d 174, footnote omitted.) An offense is considered "especially heinous, atrocious, or cruel" if it "was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" or "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."[4] (Regs, § 2402, subd. (c)(1).)
*195 "[C]ircumstances tending to establish suitability for parole are that the prisoner: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Cal.Code Regs., tit. 15, § 2402, subd. (d).)" (Rosenkrantz, supra, 29 Cal.4th at p. 654, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

C. Analysis
Dannenberg makes many contentions, but we need only consider his contention that the Governor's decision violates due process because it is not supported by some evidence that, due to the "especially heinous" nature of the commitment offense, he currently poses an unreasonable risk of danger to society if released.
At the outset, Dannenberg attacks the factual basis for the Governor's finding that the commitment offense was "especially heinous." He maintains that some evidence does not support the Governor's findings that he actively drowned his wife and that the murder was especially cruel and exceeded the minimum elements of second degree murder. Dannenberg's challenge to the factual basis for the finding that his offense was "especially heinous" must fail. There were substantial disputes about the precise facts surrounding Dannenberg's wife's death which were not resolved by the jury's second degree murder verdict. Nevertheless, as the California Supreme Court found, the evidence permitted an inference that Dannenberg, after hitting his wife multiple times in the head with a pipe wrench, either placed his wife's head into the full bathtub or knowingly failed to assist her after her head fell into the filled bathtub. (Dannenberg, supra, 34 Cal.4th at pp. 1079, 1095, 23 Cal. Rptr.3d 417, 104 P.3d 783.) While the evidence did not resolve which of these scenarios actually took place, our limited "some evidence" review of the Governor's decision compels us to credit his finding that the active drowning scenario occurred. The California Supreme Court's 2005 decision compels us to credit the Governor's findings that the murder was especially heinous because it exceeded the minimum elements of second degree murder.
However, our obligation to uphold these findings does not mean that we are necessarily bound to uphold the Governor's decision. In this case, the record does not contain even a modicum of evidence that, due to the "especially heinous" nature of his commitment offense, Dannenberg currently poses an unreasonable risk of danger to society if released.
Our deferential standard of review, which requires us to credit the Governor's findings if they are supported by a modicum of evidence, does not mean that the fact that there is a modicum of evidence that a commitment offense was "especially heinous" will eternally provide adequate support for a decision that a prisoner is unsuitable for parole. Indeed, in the wake of the California Supreme Court's decision in Dannenberg, the Courts of Appeal have elaborated on the critical distinction between the finding that the commitment offense was "especially heinous" and the nexus that links that finding to the Governor's *196 conclusion that the prisoner currently poses an unreasonable risk of danger to society if released.
"Reliance on such an immutable factor [as the nature of the commitment offense] `without regard to or consideration of subsequent circumstances' may be unfair [citation], and `runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny." (In re Scott (2005) 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905, fn. omitted (Scott); accord In re Elkins (2006) 144 Cal.App.4th 475, 496, 50 Cal.Rptr.3d 503 (Elkins).)
"The test is not [just] whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. [Citations.] Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (In re Lee (2006) 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 (Lee).) "[A] governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract but, rather, on facts indicating that release currently poses `an unreasonable risk of danger to society' [Citations]." (Elkins, supra, 144 Cal.App.4th at p. 499, 50 Cal.Rptr.3d 503.)
In Elkins, the court concluded that the nature of the commitment offense did not support the Governor's conclusion that Elkins continued to pose an unreasonable risk of danger to society if released. "`While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstancesafter nearly two decades of incarceration and half a dozen parole suitability hearingsviolates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply, on the circumstances of his or her crime is nil.' [Citations.]" (Elkins, supra, 144 Cal.App.4th at p. 500, 50 Cal.Rptr.3d 503.)
Although there has been some recent criticism of the Scott/Lee/Elkins line of cases, this criticism has primarily been directed at the fact that Scott, Lee and Elkins employed a comparative analysis of the facts in various cases to support their additional conclusions that the commitment offenses were not actually "especially heinous." (In re Roderick (2007) 154 Cal. App.4th 242, 65 Cal.Rptr.3d 16, Sepulveda, J., dissenting; In re Jacobson (2007) 154 Cal.App.4th 849, 65 Cal.Rptr.3d 222 (Jacobson).) We agree with this criticism of Scott, Lee, and Elkins.
The California Supreme Court's decision in Dannenberg precludes courts from concluding that an offense was not "especially heinous" based on a comparison to other instances of that offense. In this we have already noted, there is a modicum of evidence that Dannenberg's offense was "especially heinous" because it exceeded the minimum elements of second degree *197 murder. Therefore, it would violate the California Supreme Court's holding in Dannenberg to compare his offense to other instances of second degree murder, and we do not engage in any comparative analysis.
Jacobson also criticized the Scott/ Lee/Elkins line of cases for holding that there must be support for the Governor's decision that the prisoner currently poses an unreasonable risk of danger to society. Jacobson held that a parole unsuitability decision must be upheld so long as some evidence supports a finding that the offense was "especially heinous" without regard to whether there is a nexus between this finding and a conclusion that the prisoner currently poses an unreasonable risk of danger to society if released. We reject this criticism of Scott, Lee, and Elkins.
"[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but ... in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (Rosenkrantz, supra, 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.) It is clear from this language in Rosenkrantz that there must be "some evidence" in the record to support "the decision to deny parole, based upon the factors" rather than merely "some evidence" to support a particular factor, and Rosenkrantz repeatedly emphasized that the due process-based, some evidence standard applies to "the decision." (Rosenkrantz, at pp. 664, 128 Cal.Rptr.2d 104, 59 P.3d 174 ["the Governor's decision is subject to judicial review to ensure compliance with this constitutional mandate"] and 667.)
The regulations that govern the Board's, and the Governor's, parole suitability decisions explicitly instruct that an unsuitability decision is a conclusion that "the prisoner will pose an unreasonable risk of danger to society if released from prison." (Regs, § 2402, subd. (a).) The Governor's decision in this case was that Dannenberg "pose[s] an unreasonable risk of danger to society if released from prison" due to the fact that his offense was "especially heinous." It is this "decision" that must be reviewed under the "some evidence" standard, and the decision must be supported by some evidence. Thus, in reviewing the sufficiency of the evidence to support the Governor's decision, there must be some evidence to support the Governor's finding that Dannenberg's offense was "especially heinous," and the heinousness of the offense must support the Governor's conclusion that Dannenberg currently poses an unreasonable risk of danger to society if released.
The commitment offense is but one of the factors that the Governor was required to take into account in deciding whether Dannenberg was suitable or unsuitable for parole. The Governor explicitly conceded that the presence of every relevant suitability factor and the absence of any unsuitability factor, but for the nature of the commitment offense, supported a finding that Dannenberg was suitable for parole. The undisputed evidence supports the Governor's concession. Dannenberg has never committed any crime other than the commitment offense. His social history is extremely stable, and he has remained close to his family throughout his incarceration. The psychological reports have repeatedly found that he does not suffer from any mental problems. His prison record is spotless, and he has made realistic and solid parole plans. Dannenberg has spent his time in prison acquiring new *198 skills and additional education, and employing his skills and education in numerous valuable jobs. His work has been repeatedly praised Dannenberg has taken every available opportunity to obtain therapy and to learn skills for avoiding violence, and he has long expressed remorse for the commitment offense.
The nature of Dannenberg's commitment offense was the sole basis for the Governor's decision that Dannenberg currently poses an unreasonable risk of danger to society if released. While Dannenberg's commitment offense was grave, the record that was before the Governor lacks any evidence that now, more than two decades after his offense, the nature of Dannenberg's offense alone continues to support a conclusion that he poses an unreasonable risk of danger to society if released.
It is not the mere passage of time that deprives Dannenberg's commitment offense of predictive value with respect to the risk he may pose to society. The , quantity and quality of Dannenberg's consistent and spotless record of upstanding conduct for the last twenty years, coupled with the absence of any negative factors and the presence of every conceivable favorable factor, combine to eliminate any modicum of predictive value that his commitment offense once had. The record before the Board, upon which the Governor's decision was required to be based, lacks any support for the Governor's conclusion that, due i;o the nature of his commitment offense, Dannenberg poses a current, unreasonable risk of danger to society if released. Consequently, while there is some evidence that Dannenberg's commitment offense was "especially heinous," when measured against the minimum elements of second degree murder, the Governor's decision violates due process because there is no longer any evidence that, solely due to the nature of Dannenberg's offense, he currently poses an unreasonable risk of danger to society.

IV. Conclusion
The Governor's reversal of the Board's decision to grant parole is not supported by some evidence and cannot be upheld. Since no evidence supports any other basis for denying Dannenberg parole, it would be futile to return the matter to the Governor for further review.

V. Disposition
Dannenberg's petition is granted. The Governor's decision is vacated, and the Board's decision is reinstated. This opinion shall be final immediately with regard to this court. (Cal. Rules of Court, rule 8.264(b)(3).),
McADAMS, J., concurs.
PREMO, J., Concurring.
I concur in the judgment. I write separately to express my disagreement with the majority's criticism of the analyses in In re Lee (2006) 143 Cal.App.4th 1400, 49 Cal.Rptr.3d 931 (Lee), In re Scott (2005) 133 Cal.App.4th 573, 34 Cal.Rptr.3d 905 (Scott), and In re Elkins (2006). 144 Cal. App.4th 475, 50 Cal.Rptr.3d 503 (Elkins).
The majority notes that recent criticism of the Scott/Lee/Elkins line of cases has faulted these cases for employing "a comparative analysis of the facts in various cases to support their additional conclusions that the commitment offenses were not actually `especially heinous.'" The majority expressly agrees with that criticism. I believe the criticism is unwarranted.
Lee and Scott both reversed a Governor's parole denial and reinstated the orders of the Board granting parole. Lee reached that result by concluding there was no evidence to support the Governor's characterization of the crime as "`atrocious' " or "`especially heinous,'" that *199 "Lee's crimes were more commonplace than egregious." (Lee, supra, 143 Cal. App.4th at p. 1409, 49 Cal.Rptr.3d 931.) Scott held, "the record contains no evidence Scott committed his offense `in an especially heinous, atrocious or cruel manner,' or that the nature of his crime indicates he poses a continuing threat to the public safety if released. Indeed, the record contains abundant uncontradicted evidence to the contrary." (Scott, supra, 133 Cal.App.4th at pp. 600-601, 34 Cal.Rptr.3d 905.) Neither case weighed the relative viciousness of the crimes against similar crimes to decide whether the commitment offense was particularly egregious. They merely concluded that the crimes were not more vicious or violent than minimally necessary to support the convictions. That comparative analysis comes directly from In re Dannenberg (2005) 34 Cal.4th 1061, 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Dannenberg).
While it is true that Dannenberg held that the Board is not required to compare the commitment offense to other incidents of the same or similar criminal conduct when deciding whether to set a parole date (Dannenberg, supra, 34 Cal.4th at p. 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783), Dannenberg also held that "particularly egregious," which describes the type of commitment offense that could support an unsuitability determination, meant that the violence or viciousness of the offense was "more than minimally necessary" for the conviction. (Id. at p. 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783.) This definition presumes a comparison, albeit a comparison to the minimum elements of the crime. In my view, Lee and Scott are consistent with this analysis.
Elkins employed an entirely different analysis. Elkins effectively conceded that the commitment offense was more vicious or violent than necessary to support the inmate's first degree murder conviction but held, nevertheless, that the crime did not supply evidence to support the Governor's decision. Elkins concluded that, after 10 prior parole denials based primarily upon the gravity of the commitment offense, the prisoner's lengthy incarceration (11 years beyond his minimum eligibility date), the gains he had made over time, and his young age at the time he committed the murder (19 years old), combined to negate the predictive value of the vicious crime he perpetrated 26 years before. (Elkins, supra, 144 Cal.App.4th at pp. 500, 502, 50 Cal.Rptr.3d 503.) "[Continued reliance on [the] aggravating facts of the crime no longer amount to `some evidence' supporting denial of parole." (Id. at p. 498, 50 Cal.Rptr.3d 503.) In my view, Elkins, too, was rightly decided.
To the best of my knowledge, Elkins is the only case, aside from this one, in which the court was called upon to consider when a crime that was concededly more vicious or violent than minimally necessary could no longer support a parole denial. Although Elkins did discuss several cases from the federal courts that reversed parole denials on due process grounds (Elkins, supra, 144 Cal.App.4th at p. 501, 50 Cal.Rptr.3d 503 et seq.), the court did not rely upon comparisons to make its decision. Elkins reached its conclusion by considering the parole authority's repeated reliance upon the gravity of the commitment offense to deny parole, the length of time the inmate had already served, and all other relevant factors, which unequivocally favored release, to conclude that the commitment offense alone was not some evidence of current dangerousness. (Id. at pp. 498-500, 50 Cal.Rptr.3d 503.) That is the same analysis the majority utilizes in this case and I fully subscribe to that approach.
NOTES
[1] The Board of Parole Hearings replaced the Board of Prison Terms in July 2005. (Pen. Code, § 5075, subd. (a).) We use "the Board" to refer to both entities, since they perform the same duties.
[2] While this petition was pending, Dannenberg filed a habeas petition in the California Supreme Court. (S146376, filed 9/7/06.) That petition was summarily denied by the California Supreme Court on December 13, 2006.
[3] Subsequent references to "Regs" will be to this title.
[4] "Factors that support a finding that the prisoner committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as. an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense." (Rosenkrantz, supra, 29 Cal.4th at p. 653, fn. U, 128 Cal.Rptr.2d 104, 59 P.3d 174.)